

N O T   F O R   P U B L I C A T I O N

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

F I L E D

MAR 3 1 2008

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Case No. 05-90165-A-7 |
| SUSAN McGRATH, | ) |
| . Debtor. | ) |
| ———————————— | ) |
| LAWRENCE G. GRAY, Chapter 7 Trustee, | ) Adv. No. 07-9002 |
| Plaintiff, | ) |
| vs. | ) |
| FRANK ASSALI, et al., | ) |
| Defendants. | ) |
| ———————————— | ) |

**MEMORANDUM**

Susan McGrath filed a chapter 7 petition on January 28, 2005.  Lawrence Gray became her interim chapter 7 trustee that same day and, when no party in interest sought the election of a different trustee, Mr. Gray became the chapter 7 trustee.  See 11 U.S.C. §§ 701, 702(d).

The trustee filed this adversary proceeding on January 17, 2007.  His complaint seeks, among other things, either to declare that certain transfers of property by the defendants were void



because they were done in violation of 11 U.S.C. § 362(a),[1] or to avoid them as preferential or fraudulent transfers.   The trial having been concluded, this Memorandum contains the court's findings of fact and conclusions of law.

## I

Defendants Frank and Marie Assali owned and operated California Grown Nut Company, Inc. ("CGNC").   The Assalis held all 9000 shares of stock issued by CGNC.   Through this corporation, the Assali's operated an almond processing and packing business.   However, all real property, equipment, and facilities used by CGNC were owned by the Assalis personally and held under the fictitious business name, Assali Farms Hulling and Shelling.   To the extent used by CGNC, Assali Farms Hulling and Shelling leased this property to CGNC.

By signing a Business Purchase and Sale Agreement, Exhibit 1 ("the agreement"), on March 19, 1999 (but effective April 1, 1999), the Assalis agreed to sell to Pinochle Farms, LLC, a portion of their equity interest in CGNC and in the property owned by Assali Farms Hulling & Shelling.

Pinochle Farms was owned in equal shares by defendants Michael and Christina Staack (husband and wife) and by Patrick and Susan McGrath (husband and wife).   Christina Staack is the

---

[1]    All chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037, as enacted and promulgated prior to the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23, because Susan McGrath's bankruptcy case was filed before its effective date (generally October 17, 2005).

Assalis' daughter.  The Staacks and the McGraths had been doing business together under the Pinochle Farms name since 1996.  <u>See</u> Exhibit Y.  Their operation of Pinochle Farms predated the transaction with the Assalis and the friendship of the McGraths and the Staacks predated their business relationship.

As to CGNC, Pinochle Farms agreed to purchase 5400 shares, or 60% of the outstanding shares held by the Assails for $400,000.  Of this amount, $300,000 was payable to the Federal Land Bank Association on account of a debt owed by the Assalis, and $100,000 was payable to the Assalis.  The Assailis agreed to lend the $100,000 back to CGNC, but it was to be repaid to the Assalis by May 15, 1999.

The Assalis also agreed to transfer the facilities, equipment, and real property from their proprietorship, Assali Farms Hulling and Shelling, to a new corporation referred to in the agreement as the Huller Corporation.  Pinochle Farms was to receive 60% of the stock in the Huller Corporation and the Assalis the remaining 40%.  Pinochle Farms agreed to pay $100,000 to the Assalis by May 15, 1999 for its 60% interest.

In addition to payment of the above sums, the Assalis were to receive two promissory notes as part of the transaction.

CGNC was to give the Assalis its promissory note (First Note) in the amount of $500,000.  <u>See</u> Exhibit C.  It would accrue interest at 7%, be fully amortized over 10 years, and require annual payments beginning May 1, 2000.

The Huller Corporation was to give the Assalis its promissory note (Second Note) in the amount of $800,000.  <u>See</u> Exhibit D.  It would accrue interest at 7%, be fully amortized

over 10 years, and require annual payments beginning May 1, 2000.

Both notes were to be secured "pursuant to a written security agreement . . . whereby [CGNC] and the Huller Corporation shall grant the Assalis a security interest in all of the assets of the two Corporations. . . ." The corporations were to also execute "appropriate" financing statements to be filed and recorded in the discretion of the Assalis. While this security documentation was purportedly attached to the agreement, none was attached to the copy of the agreement introduced at trial, and no security agreement or financing statement was separately introduced into evidence. It is conceded that this security documentation was never prepared.

The notes were to be guaranteed by the buyer, Pinochle Farms, and each of its members. The guaranty was to remain in place for three years, well shy of the 10-year maturity date of the First and Second Notes.

Exhibit C is the First Note. It is dated April 1, 1999, and its maker is CGNC. The First Note indicates that it "shall be secured by a written Security Agreement from Maker to the Assalis granting a security interest in all currently existing and after acquired assets and property of Maker and their proceeds. . . ." The note also provides that "payment . . . shall also be secured by a written Guaranty from the McGraths and the Staacks to the Assalis."

To consummate the transaction, the parties formed Assali Hulling & Shelling, Inc. ("AHSI"), the Huller Corporation called for by the agreement.

////

-4-

1    Exhibit D is the Second Note.  It is dated April 1, 1999,
2 and its maker is AHSI, and it, like the First Note, provides that
3 it "shall be secured by a written Security Agreement from Maker
4 to the Assalis granting a security interest in all currently
5 existing and after acquired assets and property of Maker and
6 their proceeds. . . ."  The note also provides that "payment
7 . . . shall also be secured by a written Guaranty from the
8 McGraths and the Staacks to the Assalis."

9    Exhibit E is the guaranty of the First Note.  It is dated
10 April 1, 1999, and it is signed by the Staacks and the McGraths
11 but not by Pinochle Farms.

12    Exhibit F is the guaranty of the Second Note.  It is dated
13 April 1, 1999, and it is signed by the Staacks and the McGraths
14 but not by Pinochle Farms.

15    After the foregoing documents were signed, in late September
16 or early October 1999, Frank Assali consulted with attorney Ralph
17 Curtis.  He had Mr. Curtis review the agreement even though he
18 and all of the other parties had already executed it.

19    Mr. Curtis sent Frank Assali a letter, Exhibit 3, dated
20 October 9, 1999, with his comments regarding the agreement.
21 Based at least in part on these comments, Frank Assali met with
22 Patrick McGrath in October 1999 and requested changes to the
23 agreement.  According to Patrick McGrath, a written amendment to
24 the agreement, Exhibit 2, is the result of the meeting.  It was
25 signed on October 19 and 21, 1999 by all parties.

26    One change made by the amendment sought to minimize the tax
27 implications for the Assalis.  This was apparently done by
28 transferring the real property owned by the Assalis to a limited

-5-

1  liability company rather than to the Huller Corporation, AHSI.

2  The limited liability company created for the this purpose was

3  Central Valley Agricultural Properties (CVAP).  So, ASHI, rather

4  than receive all of the business assets owned by the Assalis,

5  received all assets except the real property.  The Assalis

6  received 40% of the equity in CVAP and in AHSI.

7       While Mr. Curtis' October 9, 1999, letter referred to the

8  possible tax ramifications of the transaction provided in the

9  agreement, his letter made no specific recommendations to

10  minimize the Assalis' taxes.  Thus, to the extent that the

11  amendment, Exhibit 2, sought to deal with this issue, the

12  Assalis' likely received other and earlier tax advice.  This is

13  clear given that CVAP, which was injected into the transaction in

14  order to "eliminate capital gains tax liability for the Assali,"

15  was formed on June 24, 1999, before Mr. Assali consulted with Mr.

16  Curtis.  Also, CVAP's articles of organization are dated June 24,

17  1999, and were filed with the California Secretary of State on

18  June 30, 1999, and the operating agreement among the members of

19  CVAP was effective on July 8, 1999.  These dates are well prior

20  to Mr. Curtis' letter.  See Exhibits 4, 5, and MM.

21       The amendment also changed the identity of the buyer in two

22  respects.  See Exhibit 1, p. 4.  First, instead of taking 60% in

23  Pinochle Farms, the Staacks and the McGraths took their interests

24  individually.  Second, instead of getting 60%, the Staacks and

25  the McGraths received 51% in the aggregate, or 12.75% each.  The

26  remaining 9% went to Agricultural Equity Partners ("AEP").  These

27  percentages applied to equity interests in CGNC, CVAP, and AHSI.

28  ///

1    The amendment also extended the effectiveness of the
2  guarantees of the First and Second Notes from three to ten years;
3  in other words, to cover the entire term of each note.

4    Mr. Assali and Ms. Staack testified that they were surprised
5  to learn during the course of this litigation that the amendment
6  changed the buyer from Pinochle Farms to the Staacks and the
7  McGraths.  While acknowledging that they signed the amendment,
8  they maintain that Mr. McGrath, in effect, "snuck" this change
9  into the document without their reading it or understanding that
10  this change had been made.

11    This does not ring true.  For several reasons, the court
12  concludes that this change was likely discussed before it was
13  agreed to by all parties.

14    First, the change from ownership by Pinochle Farms to the
15  individuals benefitted the Assalis.  It prevented the McGraths
16  from creating corporate deadlock.  That is, if the Staacks and
17  the McGraths each owned 50% of Pinochle Farms, any disagreement
18  along family lines would cause Pinochle Farms to deadlock.  And,
19  if Pinochle Farms was deadlocked, because it controlled 51% of
20  CVAP, CGNC, and AHSI, those entities would also be deadlocked.

21    In other words, as the agreement had structured the
22  transaction, even though the McGraths owned only 50% of Pinochle
23  Farms, they would hold an effective veto over any decision by
24  Pinochle Farms, CGNC, CVAP, or AHSI.  They could hold these
25  entities hostage to their whim.

26    But, if ownership of CGNC, CVAP, or AHSI was held 40% by the
27  Assalis, 25.5% by the Staacks, and 25.5% by the McGraths, the
28  Assalis and their daughter and son-in-law, the Staacks, would be

-7-

able to stymie any undesired move by the McGraths (even if the McGraths also controlled the 9% interest of AEP).

The importance of this was not lost on the McGraths. Mrs. McGrath testified that she realized that in the event of a corporate dispute, the Staacks and the Assalis were likely to be on the same side. Nonetheless, because they were good friends with the Staacks, she and Patrick McGrath went along with the change.

Thus, from the perspective of the Assalis and the Staacks, the amendment, by changing ownership through Pinochle Farms to individual ownership, made good sense. The advantage given to them by this change suggests to the court that it was with their full knowledge and agreement.

Second, the creation of CVAP came much earlier than October 19 and 21, 1999, when the amendment was signed by the parties. It was not a last minute change sprung by Patrick McGrath on the unsuspecting Assalis and Staacks as they maintained at trial.

Mr. Curtis' October 9, 1999, letter, Exhibit 3, flagged his concern regarding the possible tax ramifications to the Assalis of the transaction. His letter, however, discussed no particular tax issues and made no specific recommendations to minimize the Assalis' taxes. Mr. Curtis only recommended further study of the "tax considerations" by an accountant or someone from his office.

Because the amendment states on its face that some of the changes to the transaction were to minimize the tax consequences to the Assalis, and because Mr. Curtis recommended no specific changes, the Assalis must have received earlier tax advice from some other source. This is clear given that CVAP, which was

injected into the transaction in order to "eliminate capital gains tax liability for the Assalis," was organized before Mr. Assali even consulted with Mr. Curtis. <u>See</u> Exhibit 2, p. 4, 5, and MM.

Third, the defendants' theory as to why Patrick McGrath drafted this portion of the amendment does not jibe with the facts. The defendants believe that Mr. McGrath changed the ownership of CGNC, CVAP, and AHSI from Pinochle Farms to the individuals because he had previously informed Bank of America, which was about to fund a loan to CGNC to be guaranteed by CVAP, that the Assalis, McGraths, and Staacks owned CVAP. If the bank was told on the eve of funding the loan that Pinochle Farms actually owned the interests in CVAP, not the McGraths and the Staacks, this might necessitate redrafting the documentation and delay the loan. <u>See</u> Exhibits 6 and 7. So, according to the defendants, Mr. McGrath changed the corporate ownership structure to comport with the loan documentation already drawn up by Bank of America.

However, as noted above, the formation of CVAP occurred in June 1999, approximately four months before the October 27, 1999, loan documentation prepared by the bank. <u>See</u> Exhibits 6 and 7. This earlier corporate documentation included not only the June 24, 1999 articles of organization but also an operating agreement among the members of CVAP. Exhibits 4 and 5. The operating agreement, signed and effective July 8, 1999,[2] identifies the

---

[2]    It was suggested at trial by the defendants that the operating agreement, Exhibit 5, was not signed on July 8, 1999 because there are no dates next to the signatures. However, the preamble of the agreement indicates that it was signed on July 8.

-9-

members of CVAP as the Assalis, the Staacks, the McGraths, and
AEP.[3]  Pinochle Farms is not a member.  Each of the individuals
signed the operating agreement.[4]  Pinochle Farms did not sign it.

This sequence of events suggests to the court that the
parties settled on individual ownership of the CVAP (and the
other entities) rather than ownership through Pinochle Farms,
well before the Bank of America transaction.

Fourth, while there was a definite advantage to the Assalis
and Staacks if ownership was held by the Staacks and McGraths
individually rather than through Pinochle Farms, this arrangement
posed no obvious detriment to the Assalis or the Staacks.  The
transaction, however it was structured, would result in the
Assalis becoming the minority owners in their farming operation.
Their loss of control, however, was ameliorated by individual
ownership for the reason explained above.  The Staacks gained the
same advantage - individual ownership made it easier for them to

---

[3]    Consistent with the operating agreement, CVAP's
articles of organization, Exhibit 4, identify Patrick McGrath as
a member of CVAP; the statements of information filed with the
Secretary of State in 1999 and 2000, collectively Exhibit 8,
identify Patrick McGrath and Christina Staack as members of CVAP;
the statement of information for 2000 also attaches a page
identifying Michael Staack, Frank Assali, Marie Assali, and Susan
McGrath as the other members of CVAP; and the statement of
information for 2002, Exhibit 9, identifies Patrick McGrath as a
member of CVAP.  None of these corporate documents identifies
Pinochle Farms as a member of CVAP.

[4]    Another version of the CVAP operating agreement,
Exhibit H, was introduced at trial.  It identifies Pinochle
Farms, not the Staacks and the McGraths, as a member of CVAP.
This version, however, is not signed.  It does not even have a
signature page.  The court finds that this was a draft
considered, but rejected, by the parties given the evolution of
the transaction.

-10-

ally with the Assalis against the McGraths.  Because Pinochle
Farms was a partnership for tax purposes, and because the income
of a partnership is taxed to its partners, neither the Staacks
nor the McGraths suffered any tax disadvantage by taking their
interests as individuals rather than through a limited liability
company.

Fifth, Exhibits 5 and 9 are corporate documents concerning
CVAP.  These document describe some or all of the McGraths,
Assalis, and/or the Staacks as "members" of CVAP.  These
documents do not mention Pinochle Farms.[5]

Finally, the defendants admit that the McGraths held (and
continue to hold) individual ownership interests in AHSI and
CGNC.  This position is inconsistent with the defendants'
position that Pinochle Farms held an interest in CVAP.  The
interests of the Assalis, McGraths, and Staacks in AHSI, CGNC, as
well as CVAP, were created by the same documentation, Exhibits 1
and 2, and this documentation provided for the same ownership of
each entity – individual ownership by the McGraths and Staacks
rather than ownership through Pinochle Farms.

While concluding that the McGraths and the Staacks owned
their interests in CVAP, as well as AHSI and CGNC, individually
rather than through Pinochle Farms, the court acknowledges that
the record includes contrary evidence.

For instance, the voluminous documentary evidence presented

---

[5]    However, the probative value of Exhibit 9 is diminished
somewhat because it is signed only by Patrick McGrath.  Still, it
is a contemporaneous document predating the dispute between the
McGraths, the Staacks, and the Assalis, indicating that the
individuals were members of CVAP.

-11-

at trial, to which the court has devoted an inordinate amount of post-trial time to consider, includes exhibits suggesting that Pinochle Farms, not the McGraths and the Staacks individually, owned 51% of the equity in CVAP.  These exhibits include:

- The 2000 and 2001 income tax returns of Pinochle Farms, Exhibits QQ and SS, include schedules detailing the shares of the Staacks and McGraths, as partners of Pinochle Farms, in various pass-through entities owned by Pinochle Farms. Among the entities identified is CVAP.

- Consistent with these returns are the 2000 and 2001 income tax returns of CVAP, Exhibits VV and WW, which indicate that Pinochle Farms is one of its partners.[6]

- Pinochle Farms' financial statements for 2000 and 2001, (contained within Exhibits QQ and SS) show that Pinochle Farms owned interests in CVAP.

- In Mrs. McGrath's bankruptcy schedules, she did not identify an ownership interest in CVAP.  See Exhibit TTT (p.7 Schedule B filed January 28, 2005) and Exhibit UUU (p. 5 Amended Schedule B filed March 8, 2005).

- In Patrick McGrath's bankruptcy case, Case No. 04-

---

[6]    In the same vein are Exhibits JJJ and KKK, income tax returns for CGNC.  These indicate that Pinochle Farms owned stock in CGNC.  Yet, as noted above, at trial the defendants conceded that the McGraths and the Staacks, not Pinochle Farms, owned this stock.
    Unlike the income tax returns of CVAP, CGNC, and Pinochle Farms, the returns of AHSI (Exhibits CCC and DDD) indicate that the McGraths and the Staacks owned equity, not Pinochle Farms.  This is consistent with Exhibit 2, the amendment to the agreement, Exhibit 1, and consistent with the defendants' position at trial.

-12-

93360, he did not identify an ownership interest in CVAP in
his schedules. <u>See</u> Exhibit RRR (p.6 Schedule B filed August
31, 2004) and Exhibit SSS (p. 4 Amended Schedule B filed
October 19, 2004).  Further, in connection with an adversary
proceeding filed by the Assalis, Adv. No. 04-9165, Mr.
McGrath denied that he was personally a member of CVAP.  <u>See</u>
Exhibit VVV, p.2.  And, in a state court suit, Mr. McGrath
sought to dissolve and wind up the affairs of Pinochle
Farms.  In his pleading, Mr. McGrath asserted that Pinochle
Farms owned 51% of CVAP.  <u>See</u> Exhibit XXX, p. 4.

●     Exhibit J is a promissory note signed on July 1, 2000
(the "Combined Note").  It replaces and combines the First
Note signed by CGNC and Second Note signed by AHSI, Exhibits
C and D.  It is in the amount of $1,205,909.25, the combined
balance of the two notes as of July 1, 2000.  The maker is
Pinochle Farms.  This is inconsistent with Exhibit 2 – if
Pinochle Farms was no longer part of the transaction, one
would not expect it to be signing the new note.[7]

The court nevertheless finds that the McGraths and the
Staacks took their interests in CVAP as individuals rather than
through Pinochle Farms.  While this finding is contradicted by
some portions of the record, the position of each side is
contradicted, to some extent, by the record.  Given the
inconsistencies in the record, the most plausible and probable
interpretation of the facts is that the McGraths and the Staacks

_____

[7]     This is particularly puzzling given that the first
paragraph of Exhibit J refers to the fact that Exhibit 1 was
amended.  That amendment, Exhibit 2, among other things, removed
Pinochle Farms from the transaction.

1   took their interests in CVAP as individuals.

2       For one thing, this interpretation gives most weight to the
3   documentation, primarily the amendment to the agreement, Exhibit
4   2, prepared at the beginning of the transaction rather than later
5   documents prepared after memories had blurred.  The McGraths,
6   Staacks, and Assalis formed many interlocking business entities
7   over several years.  It is not difficult to believe that the
8   mundane, yet complex, corporate details and the terms of the many
9   transactions could be forgotten with the passage of time.

10      Also adding to the confusion is the fact that Mr. McGrath,
11  then a relatively new member of the bar, acted as the attorney
12  for many, if not all, of these transactions.  As is evident from
13  the foregoing discussion, some of the documents he drafted were
14  not consistent with other documentation.  To the extent some of
15  the inconsistent documentation represented proposed drafts of
16  agreements, they were not identified on their face as a "draft."
17  Other documents, like the security documentation, were never
18  prepared.

19      Exhibit Z is illuminating, both as to the confusion that
20  reigned and as to the structure of the transaction.  Exhibit Z
21  was "made as of August 16, 2002" and purports to amend the
22  operating agreement for Pinochle Farms, Exhibit Y.  It is signed
23  by both McGraths and Christina Staack but not by Michael Staack.[8]
24  Exhibit Z recites:

25

26      [8]     Because it is not signed by Michael Staack, the court
27  is not concluding that Exhibit Z bound the parties.  It is,
    however, signed by Christina Staack and is in some measure an
28  admission by her.

In 1999 and 2000, the Members and [Pinochle Farms]
acquired interests in three separate companies known as
[AHSI], [CGNC], and [CVAP].

This is unclear.  Did the individual members, Pinochle Farms, or

both the members and Pinochle Farms, receive interests in some or

all of the three companies?[9]  Exhibit Z goes on:

With respect to management and control by [Pinochle
Farms] of any of the companies referenced [above], it
is hereby agreed and understood by and among the
Members that each Member of the [Pinochle Farms] shall
exercise his/her interest in those referenced companies
as if it were a separate interest for each member(e.g.,
if [Pinochle Farms] is shown as 51% owner, each member
shall vote a 12.75% interest).

Exhibit Z strikes the court as an attempt by some very

confused, ill-advised people, to makes sense of a series of

complex transactions spanning several years for which they had

incomplete, and sometimes contradictory, documentation.

Considered with Exhibit 2, Exhibit Z is another piece of

evidence suggesting that, while it was initially contemplated

that the McGraths and Staacks would take their interests in two

entities, CGNC and AHSI, through Pinochle Farms, this was changed

to individual ownership of equity in three entities, CVAP, CGNC,

and AHSI.  Their final agreement was contained in Exhibit 2; it

---

[9]    This confusion is throughout the record.  For instance,
at trial the defendants maintained that Pinochle Farms owned 51%
of CVAP but that the McGraths and the Staacks, not Pinochle
Farms, owned equity interests in CGNC and AHSI.  The tax returns
(Exhibits VV, WW, CCC, DDD, JJJ, KKK), however, indicate that
Pinochle Farms owned equity in CVAP and CGNC, but the individuals
owned equity in AHSI.  Exhibit 2, the amendment to the agreement
provides that the individuals, not Pinochle Farms, own equity in
all three entities.  Finally, the bankruptcy schedules (Exhibits
RRR and SSS) filed by each of the McGraths indicate that the
individuals owned equity interests in CGNC and AHSI but not CVAP.

-15-

1   provides that the McGraths and the Staacks, not Pinochle Farms,
2   acquired equity interests in CVAP, CGNC, and AHSI.   The
3   subsequent contradictory documentation can be chalked up to
4   inattention to detail, poor lawyering, bad record keeping, and
5   general confusion created by the complexity of the many
6   transactions between the parties.[10]

7        The contradictory documents and evidence may also have its
8   genesis in the social and early business relationships between
9   the McGraths and the Staacks.   Before they formed Pinochle Farms,
10  they met regularly to play pinochle (hence the name of their
11  limited liability company).   Before the transaction with the
12  Assalis, they engaged in farming as Pinochle Farms.   Mrs. McGrath

13

14  ───────────────────────────

15      [10]    A significant point of contention between the parties
    has been the applicability of California's parol evidence rule,
16  CAL. CIV. PROC. CODE § 1856.   See Matter of California Pump &
    Mfg. Co., Inc., 588 F.2d 1334 (9th Cir. 1978).   Generally
17  speaking, parol evidence is not admissible to vary, add to, or
    contradict the terms of a written agreement that is, on its face,
18  complete and unambiguous.   The defendants maintained at trial
    that even though Exhibit 2, the amendment to the agreement,
19  clearly called for individual ownership of the equity interests
    in, among other things, CVAP, the court should permit them to
20  introduce evidence that varied this term of the agreement.   That
    is, the Assalis and the Staacks wished to offer evidence that
21  despite Exhibit 2, the agreement of the parties was that
    ownership of the equity was through Pinochle Farms.
22      While the plaintiff's argument regarding the applicability
    of the parol evidence rule had much merit, the court nonetheless
23  permitted the defendants to offer most of their parol evidence.
    It (as well as the documentary evidence not admitted, or admitted
24  for a limited purpose) has not persuaded the court that Exhibit 2
    was not the ultimate agreement of the parties, or that it was
25  ambiguous, or that the parties later agreed to modify it.
26      As outlined above, all of the evidence convinces the court
    that the parties made their agreement, as embodied in Exhibit 2,
27  and then as their dealings became more complex and long-running,
    were frequently confused and failed to act in accordance with
28  their agreement.   Nevertheless, it remained their agreement.

-16-

testified she and her husband and the Staacks were in the habit
of referring to themselves collectively as "Pinochle."  It is not
too surprising, then, that they would refer to Pinochle Farms and
the individual members of Pinochle Farms interchangeably.

## II

Having determined that the McGraths and the Staacks owned
interests in CVAP, it is necessary to consider whether the
Assalis' seizure of those interests violated the automatic stay
created by the filing of Mrs. McGrath's chapter 7 petition or is
otherwise avoidable.

## A

By the summer of 2003, relations between the McGraths,
Staacks, and Assalis had deteriorated.  The sale of the Starn
Ranch was indicative of the rift between the McGraths, on the one
hand, and the Assalis and the Staacks, on the other hand.

CVAP first purchased the Starn Ranch on or about February
25, 2000.  The purchase agreement is signed on behalf of CVAP by
Patrick McGrath, Frank Assali, and Christina Staack.  See Exhibit
15.  Pinochle Farms did not purport to sign the agreement as a
member of CVAP.  In connection with this purchase, CVAP gave the
seller a $60,000 promissory note secured by a deed of trust
encumbering the Starn Ranch.  The note, Exhibit 16, was likewise
executed by Patrick McGrath, Frank Assali, and Christina Staack
as "members" of CVAP.[11]

---

[11]    The foregoing further buttresses a finding that
Pinochle Farms did not own an interest in CVAP.

1    After CVAP's purchase, the Starn Ranch was used as
2  collateral for a loan from a third party in or about June 2002.
3  See Exhibit 18.  CVAP repaid the third party when it sold the
4  Starn Ranch on or after June 7, 2004.  See Exhibit 19.
5    The deed given by CVAP to its buyer, Exhibit 19, was signed
6  on behalf of CVAP by Frank Assali, Michael Staack, and Christina
7  Staak.  It was also signed on behalf of Pinochle Farms by the
8  same three individuals.  Neither of the McGraths signed the deed
9  in any capacity.
10    The signatures on the deed are troubling for several
11  reasons.
12    First, to the extent the deed was signed on behalf of
13  Pinochle Farms, its signature was unnecessary because it did not
14  own an interest in the Starn Ranch or in CVAP.
15    Second, even if the Pinochle Farms' signature was necessary,
16  Frank Assali was not a member of Pinochle Farms and could not
17  sign on its behalf.
18    Third, while the operating agreement for CVAP, Exhibit 5,
19  provided at section 6.6 that real property owned by CVAP could be
20  transferred "by a conveyance executed in the . . . name [of CVAP]
21  by any Member," section 6.5.4 limited the authority of a member
22  to transfer property other than inventory "without the consent of
23  the of the [sic] Members. . . ."  There is no evidence that the
24  McGraths, as members of CVAP, consented to the transfer of the
25  Starn Ranch.
26    Fourth, and to the extent it might be argued that Pinochle
27  Farms rather than the McGraths and Staacks owned the equity in
28  CVAP, its operating agreement, Exhibit Y, required at section

-18-

4.2, that transactions be approved by "Members holding a majority of the Membership Interests. . . ." if the transaction involved a sale of all or substantially all of the Pinochle Farms assets, or amounted to an "alteration" of its almond cultivation, production and sale business. See also Exhibit X (amendment to articles of organization of Pinochle Farms requiring "the signature of three (3) Members . . . to sign all contracts and obligations" of Pinochle Farms).

Clearly, selling farm ground required a contract and any sale would alter the farming business of Pinochle Farms. Yet, "a majority of the Membership Interests" did not sign the deed. Only half in number and amount of the membership interests signed it.

Given these problems with the signatures on the deed, one can surmise that something was afoot. Just what was afoot became abundantly clear approximately 10 days later.

B

On June 18, 2004, the Assalis sent a written demand, Exhibit 20, to Pinochle Farms and its members, the McGraths and Staacks. This demand noted that CGNC and AHSI had failed to make the installments due on April 1, 2004 under the terms of the First Note and the Second Note, Exhibits C and D, and because of this default the Assalis exercised their right to accelerate both notes. They demanded payment of a total of $1,110,678.63. If not paid, the Assalis expected the McGraths and Staacks to make the payment pursuant to their guaranties, Exhibits E and F.

///

-19-

This demand is puzzling for two reasons.

First, it demands payment pursuant to the First Note and Second Note and the written guaranties of each.  But, the demand is addressed to Pinochle Farms.  Pinochle Farms did not sign the First Note, the Second Note, or either guaranty.  CGNC signed the First Note, AHSI signed the Second Note, and the McGraths and the Staacks signed the two guaranties.

Second, this demand was not made under the correct note.  By this time, the First Note and the Second Note had been replaced by a Combined Note executed by Pinochle Farms, Exhibit J.[12]

Further, because the two guaranties pertained to the First Note and the Second Note, and because these guaranties were not replaced with a guaranty of the Combined Note, a demand on the individuals under the guaranties likewise made no sense.

Regardless of who was the proper target for the demand, the demand was not met.  The Assalis were not paid.

Unable to pay, Patrick McGrath filed a chapter 11 petition on August 31, 2004.  His petition was converted to one under chapter 7 on May 13, 2005.

On November 24, 2004, the Assalis again made a written demand for payment.  Their second demand, Exhibit P, was sent to Pinochle Farms and its members.[13]  This time, the demand was made

---

[12]    As noted above, given that Exhibit 2 had removed Pinochle Farms from the original transaction first described in the agreement, Exhibit 1, the Combined Note is inconsistent with Exhibit 2.  Because the McGraths and Staacks acquired equity in CVAP, CGNC, and AHSI, one would expect that they, not Pinochle Farms, would have been the maker of the Combined Note.

[13]    It was sent to Mr. McGrath despite the fact that he was then protected by the automatic stay of 11 U.S.C. § 362(a).

1  under the terms of the Combined Note.  The Assalis demanded
2  payment of $964,001.23.

3       The first demand was in the total amount of $1,110,678.63,
4  but the second demand was for less, $964,001.23.  Because no
5  payments had been made to the Assalis since April 1, 2004 (as
6  stated in both demands), the fact that their demand decreased by
7  $146,676.77 seems strange.  However, it must be kept in mind the
8  sale of the Starn Ranch occurred sometime after the first demand
9  and before the second demand.  If the Assalis had received no
10 payments, their first demand would have accrued additional
11 interest of $30,914.87 [$196.91 per day for 157 days on
12 $1,110,678.63], increasing it to $1,141,593.50.  But, their
13 second demand actually decreased by $146,676.77, to $964,001.23.
14 This leads the court to conclude that the decrease was the result
15 of application of the Starn Ranch net sale proceeds to the
16 Assalis' claim.

17      The November 24 letter also demands that the members of
18 Pinochle Farms surrender its 51% interest in CVAP which the
19 Assalis maintained was security for the Combined Note.  Once it
20 was surrendered, the Assalis intended to foreclose on that
21 interest under the Commercial Code.

22      No monetary demand was made on the McGraths or Staacks other
23 than to remind them that if they did not cause Pinochle Farms to

25
26 Perhaps the Assalis believed that because their letter limited
its demand to Pinochle Farms' surrender of its putative interest
27 in CVAP, and did not demand money from Mr. McGrath, they were not
violating the automatic stay.  It is unnecessary to resolve this
28 issue because whether the demand violated Mr. McGrath's automatic
stay is not before the court.

-21-

1  surrender its interest in CVAP, and to the extent the Assalis
2  were not paid, they would be liable on their written guaranties.
3      As explained above, the guaranties, Exhibits E and F,
4  guaranteed payment of the First Note and the Second Note, not the
5  Combined Note.  There is no separate guaranty of the Combined
6  Note.  However, this is unimportant.  The McGraths and Staacks
7  signed the Combined Note both on behalf of Pinochle Farms and as
8  individuals.  Hence, they had liability as a maker of the
9  Combined Note even though it does not expressly refer to them as
10 its makers.
11     Of course, the problem with the November 24 demand is that
12 Pinochle Farms did not own an interest in CVAP.  Further, even if
13 it owned an interest, no security documentation was ever prepared
14 pledging that interest as collateral.
15     Exhibit 1, the original agreement, while contemplating that
16 Pinochle Farms would be the buyer of CGNC and AHSI, required CGNC
17 and AHSI to make the two notes, Exhibits C and D, and to secure
18 those notes with all of their corporate assets.  See Exhibit 1, §
19 4(c).  Pinochle Farms and its members were obligated only to
20 guarantee the two notes.  See Exhibit 1, § 4(d).[14]
21     Exhibit 2 substituted the McGraths and Staacks in place of
22 Pinochle Farms as the buyer.  Exhibit 2 did not, however, revise
23 the notes, the guarantees, or the security for the note called
24 for in the agreement, Exhibit 1.  The parties nonetheless
25 ///

26

27     [14]   In fact, the guaranties, Exhibits E and F, were signed
28 only by the McGraths and Staacks.  Pinochle Farms did not sign
   them.

-22-

1  replaced the First Note and the Second Note with the Combined
2  Note.  See Exhibit J.

3      The maker of the Combined Note is defined by its terms to be
4  Pinochle Farms.  See Exhibit J, p. 2.  While the McGraths and the
5  Staacks signed the note, both on behalf of Pinochle Farms and as
6  individuals, they are not specifically referred to in the
7  Combined Note as its makers.

8      The Combined Note specified that all of the maker's (i.e.,
9  Pinochle Farms') "currently existing and after acquired assets
10 and property . . . and their proceeds" would secure the Combined
11 Note under the terms of a written security agreement.  The note
12 purports to incorporate by reference that written security
13 agreement.

14     There are three problems with this attempted pledge of
15 security.

16     First, there is no written security agreement.  Hence, no
17 security interest attached.  See Cal. Comm. Code §§ 9102(a)(7) &
18 (a)(73) and 9203(b)(3)(A).

19     The argument that Exhibit 1 and/or the Combined Note can be
20 considered a security agreement is unpersuasive.

21     As to Exhibit 1, it anticipates only that CGNC and AHSI, not
22 Pinochle Farms, would pledge assets as collateral for the
23 original notes.

24     As to the Combined Note, it fails to contain words granting
25 a present security interest to the Assalis.  It speaks in the
26 future tense - the Combined Note "shall be secured by a written
27 Security Agreement. . . ."  This suggests that the grant of a
28 security interest will be given in another document; it is not

-23-

being granted by the Combined Note.[15]  This language in the
Combined Note is insufficient to establish that Pinochle Farms
intended to create and grant a security interest.  See Cal. Comm.
Code § 9203(b).

Contrast the language in the Combined Note with that
discussed in Nolden v. Plant Reclamation (In re Amex-Protein Dev.
Corp.), 504 F.2d 1056 (9th Cir. 1974).  There a promissory note
contained a handwritten inscription reading, "This note is
secured by a Security Interest in subject personal property as
per invoices."  The court found that there was no doubt about the
identity of the "invoices" and therefore the promissory note
qualified as a security agreement because it "creates or provides
for" a security interest.  Nolden 504 F.2d at 1056.

In this case, not only does the Combined Note not use the
present tense, it states on its face that the security agreement
will be granted in a separate agreement that was never prepared,
much less signed.

Also, the description in the Combined Note of the putative
collateral is too broad.  It essentially says all property of the
Pinochle Farms will secure the Combined Note.  However, a
description of "all the debtor's assets" or "all the debtor's
personal property" or similar phrases is not sufficient in a
security agreement.  See Cal. Comm. Code § 9108(c).  Such

---

[15]    Even if the court ignored the fact that Exhibit 1 did
not require Pinochle Farms to pledge any security for the First
Note and/or the Second Note, section 4(c) of Exhibit 1 presents
the same problem for the Assalis.  It provides that a security
interest will be granted (not, "is" granted) and will be granted
in a separate security agreement.

-24-

phrasing may be sufficient for a financing statement, <u>see</u> Cal. Comm. Code § 9504(2), but a security agreement must describe collateral within the parameters of Cal. Comm. Code § 9108.

Second, assuming a written security agreement signed by Pinochle Farms that adequately describes the interest in CVAP as collateral for the Combined Note, the security interest was not perfected.

There is nothing in the operating agreement of CVAP (or otherwise in the record) indicating that the members of CVAP received certificated or uncertificated securities representing their interests in CVAP. So, whether the interest in CVAP is regarded as a general intangible or as investment property, in order to perfect a security interest in it, it was necessary to file a financing statement with the California Secretary of State. <u>See</u> Cal. Comm. Code §§ 9310, 9312(a), 9313(a), 9314(a), 9501(a).

No financing statement was prepared contemporaneously with the Combined Note. However, on November 15, 2004, nine days before sending his second demand, Frank Assali filed a financing statement. <u>See</u> Exhibit PPP. But, it was ineffectual because Mr. Assali had no authorization to file it. A financing statement is effective only to the extent that it was filed by a person authorized by Cal. Comm. Code § 9509. <u>See</u> Cal. Comm. Code § 9510. Cal. Comm. Code § 9509 authorizes a person to file a financing statement only if the debtor authorizies the filing of an authenticated record. <u>See</u> Cal. Comm. Code § 9509(a)(1). By signing a security agreement, the debtor authorizes the secured creditor to file a financing statement covering the collateral

-25-

described in the security agreement and identifiable proceeds.
See Cal. Comm. Code § 9509(b).

Pinochle Farms did not sign a security agreement, therefore Mr. Assali was not authorized to file the financing statement.

Third, even if there was a security agreement adequately describing the collateral, and further assuming the security interest was perfected, Pinochle Farms did not own an equity interest in CVAP that it could pledge as security for the Combined Note.

Therefore, the court concludes that the Assalis did not have a security interest in the 51% interest of the McGraths and Staacks in CVAP. Further, even assuming that the interest was held, not by these individuals, but by Pinochle Farms, the Assalis did not have an attached or perfected security interest in it.

C

Unsurprisingly, the Staacks responded to the Assalis' November 24 demand by agreeing to sign over the putative interest of Pinochle Farms in CVAP. This was done on November 26, 2004. See Exhibit 21.

It is important to note that this transfer was not in satisfaction of the Combined Note. Rather, the assignment was to facilitate a later foreclosure sale by the Assalis of the interest in CVAP. The Staacks gave the assignment "solely for the purpose of [the Assalis] enforcing their security inter-est. . . ." See Exhibit 21, p. 3.

///

On January 28, 2005, before the Assalis acted on the
assignment and foreclosed on the CVAP interest, Mrs. McGrath
filed her chapter 7 petition.

Despite the filing of this second bankruptcy petition, the
Assalis sent a letter dated April 8, 2005 to Pinochle Farms and
its members, the McGraths and Staacks. See Exhibit 22. This
letter proposed to retain Pinochle Farms' putative interest in
CVAP pursuant to Cal. Comm. Code § 9620 in full satisfaction of
the amount due under the Combined Note, $986,663.02.[16] The
Assalis also agreed that the Staacks and McGraths would have no
liability on their guarantees of the Combined Note.[17]

The April 8 letter argued that this retention was in the
best interests of Pinochle Farms because CVAP had a value, net of
secured debt, of $1,266,715.54. Thus, Pinochle Farms' putative
51% interest in CVAP had a value of $646,024.93 while its
liability under the Combined Note was $986,663.02. The Assalis
were willing to walk away from the $340,638.09 deficiency.

The Staacks were not only in favor of the retention by the
Assalis, but they purported to act for Pinochle Farms by
permitting, in writing, the Assalis to retain the interest in
CVAP. See Exhibits 23, U, and V.

///

[16] This was an increase from the $964,001.23 demanded on
November 24, 2004. The increase is attributable to the accrual
of additional interest.

[17] Of course, as noted above, the McGraths and the Staacks
did not sign a guaranty for the Combined Note. Their personal
liability was due to their signing the Combined Note in their
individual capacities.

-27-

Because Mrs. McGrath owned 12.75% of the interest in CVAP, the enforcement of the Assalis' claim against her interest after the filing of her bankruptcy petition violated the automatic stay. <u>See</u> 11 U.S.C. § 362(a)(3), (a)(6).

Acts in violation of the automatic stay are void. <u>See</u> <u>Schwartz v. United States (In re Schwartz)</u>, 954 F.2d 569, 571 (9th Cir. 1992). However, in this case, it is not enough to just declare the retention of Mrs. McGrath's interest in CVAP was and is void. This is because the Assalis, with the cooperation of the Staacks, have caused CVAP to transfer all of its real and personal property to the Assalis or to an entity they control, Assali Farm Properties, LP. <u>See</u> Exhibit 24. After these transfers CVAP was dissolved. Therefore, any remedy will take the form of damages.

<div align="center">1.</div>

When a creditor willfully violates the automatic stay, an individual debtor may recover damages from the offending creditor. <u>See</u> 11 U.S.C. § 362(h). Once the creditor becomes aware of the filing of the bankruptcy petition, which triggers the automatic stay, an intentional act that violates the stay is willful. <u>See</u> <u>Goichman v. Bloom (In re Bloom)</u>, 875 F.2d 224, 227 (9th Cir. 1989).

The Assalis willfully violated the automatic stay by demanding and taking Mrs. McGrath's interest in CVAP. The Staacks also willfully violated the automatic stay by purporting to transfer her interest to the Assalis in satisfaction of the debt owed by Mrs. McGrath as well as Mr. McGrath and themselves.

1  Each of these acts was taken after the petition was filed and
2  with knowledge of the petition.

3      While the Assalis and the Staacks may have believed that
4  Pinochle Farms owed the interest in CVAP rather than Mrs. McGrath
5  and the other individuals, this does not shelter them from
6  liability under section 362(h).  This is because liability under
7  section 362(h) does not require that the creditor act with
8  specific intent of violating the automatic stay.  Once a creditor
9  knows that a petition has been filed, the creditor bears the risk
10 of all intentional acts that violate the automatic stay.  In the
11 words of the Ninth Circuit in <u>Goichman v. Bloom (In re Bloom)</u>,
12 875 F.2d 224, 227 (9th Cir. 1989):

13      'A 'willful violation' does not require a specific
        intent to violate the automatic stay.  Rather, the
14      statute provides for damages upon a finding that the
        defendant knew of the automatic stay and that the
15      defendant's actions which violated the stay were
        intentional.  Whether the party believes in good faith
16      that it had a right to the property is not relevant to
        whether the act was 'willful' or whether compensation
17      must be awarded.'  <u>INSLAW, Inc. v. United States (In re</u>
        <u>INSLAW, Inc.)</u>, 83 B.R. 89, 165  (Bankr. D.D.C. 1988).
18

19      <u>Associated Credit Svcs. v. Campion (In re Campion)</u>, 294 B.R.
20 313 (B.A.P. 9th Cir. 2003), is also instructive.  There, the
21 bankruptcy court awarded damages, fees, and costs for a willful
22 violation of the automatic stay committed by a creditor who,
23 knowing that "Michael P. Campion" was a debtor in a bankruptcy
24 case, garnished his wages because its computer failed to
25 recognize that "Michael P. Campion" of Spokane, Washington, and
26 "Mike P. Campion" of Spokane, Washington, were the same
27 individual.
28 ///

-29-

1    Once a creditor knows that the automatic stay exists, the
2    creditor bears the risk of all intentional acts that violate the
3    automatic stay regardless of whether the creditor means to
4    violate the automatic stay.  Id. at 317-18.

5    Here, the defendants were aware of Mrs. McGrath's bankruptcy
6    petition.  They nonetheless proceeded to retain the interest in
7    CVAP in violation of the automatic stay apparently because they
8    were under the impression that Mrs. McGrath did not own a portion
9    of that interest in CVAP.  Their error cannot save them.

10    Nor is it helpful to the defendants' defense that they
11    consulted attorneys who advised them they could go ahead with the
12    seizure and retention of the interest in CVAP.  Advice of counsel
13    is not a defense.  As observed by the Ninth Circuit in Tsafaroff
14    v. Taylor (In re Taylor), 884 F.2d 478, 483 (9th Cir. 1989):

15        '[T]he stay is a broad provision which requires a
         creditor to seek a judicial determination of its right
16        to proceed.'  (Emphasis added.)  It would contravene a
         fundamental policy of federal bankruptcy law to allow
17        creditors to proceed with actions possibly subject to
         the stay merely upon the advice of an attorney that
18        they are entitled to proceed.  Accordingly, because
         'good faith reliance on the advice of counsel' is not a
19        defense, Taylor is entitled to an award of actual
         damages, costs, and attorney fees to the extent she was
20        injured by the 'willful violation.'  [Quoting trial
         court.]
21

22    What was Mrs. McGrath's interest in CVAP worth when it was
23    retained by the Assalis?  At trial, the trustee complained that
24    the defendants had not cooperated during discovery and had failed
25    to provide records he demanded that were crucial to the valuation
26    of this interest.  So, rather than offer evidence of value, he
27    asks that the court order the defendants to account for the
28    interest Mrs. McGrath had in CVAP.

-30-

If the defendants were not complying with his discovery requests, the trustee should have moved to compel responses to that discovery. But, the trustee did not file any discovery motions. And, the court is not convinced from the evidence at trial that the defendants failed to produce information and documentation. For these reasons, the court will not order the defendants to account for the value of Mrs. McGrath's interest in CVAP as requested in the eighth and ninth claims for relief.

Still, there is evidence in the record that permits the court to place a value on Mrs. McGrath's 12.75% interest in CVAP as of the date it was retained by the Assalis. In their letter of April 8, 2005 (Exhibit 22), the Assalis admitted that CVAP then had a value, net of secured debt, of $1,266,715.54. Based on this valuation, Mrs. McGrath's interest had a value of $161,506.23. At a minimum, under section 362(h) the trustee would be entitled to this sum plus prejudgment interest at the applicable federal judgment rate from the date of the retention, April 11, 2005. See Exhibit 23.

2.

However, the trustee has an insurmountable problem making a claim for damages pursuant to section 362(h). In Havelock v. Taxel (In re Pace), 67 F.3d 187, 192 (9th Cir. 1995), the Ninth Circuit held that even though a bankruptcy trustee was a natural person (i.e., in the language of section 362(h), an "individual"), the trustee represented the interest of the bankruptcy estate, not that of a natural person. As a result, the violation of the automatic stay caused damage to the estate,

1  not to the trustee.

2     This does not mean that a trustee is unable to seek redress

3  for the defendants' violation of the automatic stay.  It means

4  only that the trustee has no private right of action under

5  section 362(h).  See Knupfer v. Lindblade (In re Dyer), 322 F.3d

6  1178, 1190-91 (9th Cir. 2003).  The trustee instead may seek a

7  recovery of damages for a violation of the automatic stay under

8  11 U.S.C. § 105(a) "as a sanction for ordinary civil contempt."

9  Pace, 67 F.3d at 193.

10     A party is in civil contempt if the evidence clearly and

11 convincingly establishes that the party violated a specific and

12 definite order of the court.  See Dyer, 322 F.3d at 1191; Renwick

13 v. Bennett (In re Bennett), 298 F.3d 1059, 1069 (9th Cir. 2002).

14 "Because the 'metes and bounds of the automatic stay are provided

15 by statute and systematically applied to all cases,' Jove Eng'g

16 v. IRS (In re Jove Eng'g), 92 F.3d 1539, 1546 (11th Cir. 1996),

17 there can be no doubt that the automatic stay qualifies as a

18 specific and definite court order."  Dyer, 322 F.3d at 1191.

19     As is the case with section 362(h), "the threshold standard

20 for imposing a civil contempt sanction in the context of an

21 automatic stay violation . . . dovetails with the threshold

22 standard for awarding damages under § 362(h)."  Id.  See also

23 Pace 67 F.3d at 191.  In both instances, the threshold standard

24 supporting a damage award is not "a finding of 'bad faith' or

25 subjective intent, but rather on a finding of 'willful-

26 ness'. . . ."  Dyer, 322 F.3d at 1191.  Willfulness does not

27 require a specific intent to violate the automatic stay.  Damages

28 may be awarded if "the defendant knew of the automatic stay" and

if the defendant's actions were intentional.  <u>Pace</u>, 67 F.3d at
191.

     In this case, the defendant's conduct was intentional.  As
noted above, it is also clear that the defendants knew of Mrs.
McGrath's bankruptcy petition when the Assalis demanded that they
be permitted to retain the interest in CVAP and when the Staacks
consented to the retention.  It is less clear, however, that they
understood that the automatic stay created by the filing of her
petition was an impediment to their actions.

     As explained above, under section 362(h) it is unnecessary
that the defendants have knowledge of the automatic stay.
However, in the civil contempt context, "a party cannot be held
in contempt for violating an injunction absent knowledge of that
injunction."  <u>Dyer</u>, 322 F.3d at 1191-92.

     The trustee has established that the defendants were aware
of the automatic stay and its applicability.  The trustee's
position was made known to the defendants by his complaint
demanding the return of Mrs. McGrath's interest in CVAP or its
value.

     Because a creditor violating the automatic stay has an
obligation to restore the status quo, once apprised of the
trustee's demand, the Assalis had an obligation to restore the
status quo.  <u>See Calif. Employment Dev. Dept. v. Taxel (In re Del
Mission)</u>, 98 F.3d 1147, 1151(9th Cir. 1996); <u>Eskanos & Adler,
P.C. v. Leetien</u>, 309 F.3d 1210, 1213-15 (9th Cir. 2002).  When
they thereafter failed to return Mrs. McGrath's interest in CVAP
or its value to the trustee, they were in civil contempt of this
court.  At that point, the trustee accrued the right to recover

the value of Mrs. McGrath's CVAP interest, $161,506.23, plus interest at the applicable federal judgment rate from the filing of the complaint.   This is a "compensatory" remedy that is "necessary" to enforce the Bankruptcy Code.   See Dyer, 322 F.3d at 1193; 11 U.S.C. § 105(a).   This recovery is appropriate under the fifth claim for relief made in the complaint.

There are two consequences to the trustee as a result of proceeding under section 105(a) rather than under section 362(h).

First, because recovery for contempt under section 105(a), unlike under section 362(h), requires that the defendants be aware of the automatic stay, interest will accrue from the date they became aware of the automatic stay (the date of the complaint) rather than the date the interest in CVAP was retained.

Second, it means that the Assalis but not the Staacks are liable for the value of Mrs. McGrath's CVAP interest.   This is because at the point in time the complaint was served on the Staacks, they had already consented to the Assalis' retention of that interest and were no longer in a position to give it back to the estate.   The Assalis alone were in that position and they alone are liable.

3.

Even if the transfer of Mrs. McGrath's 12.75% interest in CVAP were not void because it was in violation of the automatic stay, this transfer would be voidable under three alternate theories.

///

First, the trustee may also recover the value of Mrs.
McGrath's CVAP interest from the Assalis under 11 U.S.C. §
542(a), as requested in the eighth claim for relief.  Section
542(a) requires any person "in possession, custody, or control,
during the case, of property that the trustee may use, sell, or
lease . . . [to] deliver to the trustee . . . such property or
the value of such property. . . ."

As established above, Mrs. McGrath individually owned a
12.75% interest in CVAP.  This interest was property of her
bankruptcy estate that the trustee was entitled to administer for
the benefit of creditors.  When her petition was filed, the
Assalis had control of the interests in CVAP but had not yet
foreclosed upon the McGraths' and the Staacks' interests.
Therefore, it was incumbent on the Assalis either to return Mrs.
McGrath's interest to her trustee or to pay him its value.

Second, the transfer of Mrs. McGrath's interest in CVAP may
be avoided pursuant to 11 U.S.C. § 549 as requested in the fourth
claim for relief.  Section 549 permits the trustee to avoid any
post-petition transfer of property of the bankruptcy estate that
is not authorized by the court.

As explained above, Mrs. McGrath individually owned 12.75%
of the equity in CVAP.  This interest was property of the
bankruptcy estate.  See 11 U.S.C. § 541(a)(1).  The court was not
asked by the defendants to permit the transfer of her interest to
the Assalis.  As a result, 11 U.S.C. § 550(a) permits the trustee
to recover the value of the interest from the Assalis.

Third, to the extent the Assalis maintain that they were
secured by Mrs. McGrath's interest in CVAP, their security

-35-

1   interest (assuming one even attached) was unperfected for the
2   reasons discussed above.  Hence, the trustee's strong-arm powers
3   under 11 U.S.C. § 544(a) permit him to avoid the transfer of Mrs.
4   McGrath's interest pursuant to the sixth claim for relief.

5       A theory of recovery not available, however, is the tort of
6   conversion.  This is the seventh claim for relief made in the
7   complaint.

8       Under California law, recovery for conversion is limited to
9   cases involving tangible personal property.  See WITKIN, SUMMARY OF
10  CALIFORNIA LAW, TORTS § 701 (2007).  Therefore, liability for
11  conversion of an interest in a business entity will lien only
12  when the defendant has taken something tangible representing the
13  interest, like shares of stock.  Here, there is no evidence that
14  Mrs. McGrath (or anyone else) had been issued shares of stock in
15  CVAP and that these shares were wrongfully taken by the Assalis.

16      Therefore, no relief will be ordered under the seventh claim
17  for relief or under the tenth claim for relief (conspiracy to
18  convert Mrs. McGrath's interest in CVAP).

19
20                                  4.

21      Because the court has concluded that the bankruptcy estate
22  was injured by the Assalis' willful violation of the automatic
23  stay, pursuant to the fifth claim for relief it is entitled to
24  recover the actual and necessary attorney's fees and costs
25  incurred in connection with the recovery of the value of Mrs.
26  McGrath's interest in CVAP.

27      Attorneys' fees are an appropriate component of a civil
28  contempt award.  See Dyer, 322 F.3d at 1195.  And, "reasonable

-36-

1  attorneys' fees incurred in the process of voiding the violation
2  of the automatic stay [are] properly awarded as compensatory
3  damages for the violation." Id.

4       Therefore, prior to entry of a judgment, the court will
5  permit the trustee to file a motion which itemizes the attorneys'
6  fees incurred in connection with the claim based on a violation
7  of section 362(a). This is not a license to request all fees
8  incurred in this adversary proceeding. Rather, only the fees
9  related to the violation of the automatic stay may be sought.
10 The motion, of course, must be set for hearing on notice to the
11 defendants who may challenge the reasonableness and/or necessity
12 of the fees requested.

13      As the prevailing party, the trustee is entitled to recover
14 these costs. Fed. R. Bankr. P. 7054(b) deals with the allowance
15 of costs other than attorney's fees. Costs are those expenses
16 incurred in the maintenance of an action on a claim which the law
17 awards to the prevailing party and against the losing party as an
18 incident of a favorable judgment. JAMES MOORE ET AL., MOORE'S MANUAL
19 FEDERAL PRACTICE AND PROCEDURE § 25.06 (2001).

20      The costs that may be taxed to the losing party are set out
21 in 28 U.S.C. § 1920. These costs consist of court costs (such as
22 the original filing fee), service of process fees, court reporter
23 fees, docket fees, and compensation of court appointed experts.

24      The trustee may request such costs in the manner specified
25 by Rule 7054(b).
26 ///
27 ///
28 ///

5.

Section 362(h) permits the court to grant punitive damages "in appropriate circumstances." Section 105(a), on the other hand, includes no express authorization to assess punitive damages or to otherwise punish those in contempt of court. See Dyer, 322 F.3d at 1193. Thus, the Ninth Circuit has emphasized that damages under section 105(a) should be limited to compensatory awards; punitive awards, whether labeled as punitive damages or sanctions, are not permitted. Id.

Even under section 362(h), an award of punitive damages hinges on more than a showing that there has been a willful violation of the automatic stay. Punitive damages may not be awarded absent some showing of reckless or callous disregard for the law or rights of others. See Protectus Alpha Navigation Co. v. North Pacific Grain Growers, Inc., 767 F.2d 1379, 1385 (9th Cir. 1985).

The court is unconvinced that, assuming it could award punitive damages under section 105(a), that it should award punitive damages in this case. The court does not believe that the Assalis or the Staacks were animated by a reckless or callous disregard for the law or the rights of the bankruptcy estate or of Mrs. McGrath. As is clear from the lengthy discussion above, they were presented with a very confused, contradictory, and incomplete record that created ambiguity as to who owned the equity in CVAP. They do not deserve to be punished for incorrectly deciphering this tangled web.

///

///

-38-

III

Mrs. McGrath's interest in CVAP was implicated in a pre-petition transfer to the Assalis. As recounted above, CVAP owned the Starn Ranch. It sold this property on or after June 7, 2004 without the participation of either of the McGraths.[18] Sometime between the June 18, 2004 demand for payment by Assalis on the McGraths and the Staacks, and their November 24, 2004 demand, the net sale proceeds, at least $146,676.77, were paid over to the Assalis.

At first blush, it is tempting to conclude that the payment by CVAP to the Assalis cannot be avoided as a preferential transfer in Mrs. McGrath's bankruptcy case because it was a transfer of CVAP's property, not Mrs. McGrath's property. See 11 U.S.C. § 547(b).

However, CVAP did not owe anything to the Assalis. It was not a maker of the First Note, the Second Note, or the Combined Note. Nor did CVAP execute, or agree to execute, any guaranty of these notes.

Hence, any payment from CVAP to the Assalis was not made on account of its own obligation. Rather, the Assalis, with the assistance of the Staacks, seized the sale proceeds because Mrs. McGrath (as well as Mr. McGrath and the Staacks) owed them money. In effect, the Assalis and the Staacks caused CVAP to make a distribution to its members and then the Assalis intercepted 51% of those proceeds, the $146,676.77 due to the individual members other than the Assalis, and applied these proceeds to their

---

[18] See discussion above p. 17-19.

1    demand.

2         This transfer occurred within one year of the filing of Mrs.

3    McGrath's bankruptcy petition.  See 11 U.S.C. § 547(b)(4)(B).  It

4    was made to the Assalis on account of a delinquent, antecedent

5    debt owed by Mrs. McGrath prior to the transfer.  See 11 U.S.C. §

6    547(b)(1) and (2).

7         The remaining two requirements for avoidance of a

8    preferential transfer, insolvency of the debtor (see 11 U.S.C. §

9    547(b)(3)) and a preferential benefit (see 11 U.S.C. §

10   547(b)(5)), are easily established by consideration of the

11   McGraths' bankruptcy schedules.  See Exhibits RRR through UUU.

12        Their schedules of assets and liabilities reveal that they

13   were hopelessly insolvent within the meaning of 11 U.S.C. §

14   101(32)(A).  For instance, Mrs. McGrath's original schedules

15   recorded total assets of $566,025, secured debts of $505,659,

16   priority claims of $152,376.08, and unsecured debt of

17   $3,336,671.76.  None of the amendments to her schedules

18   materially changed this picture of insolvency.

19        And, this picture indicates that holders of unsecured

20   claims, like the Assalis, were and are unlikely to receive

21   anything in a chapter 7 liquidation.  The transfer of Mrs.

22   McGrath's share of the $146,676.77, $36,669.19, permitted the

23   Assalis to receive more on account of their unsecured claim than

24   they would receive in the bankruptcy case.

25        Therefore, pursuant to the second claim for relief, this

26   transfer was preferential and the trustee may recover the

27   ///

28   ///

1    $36,669.19 from the Assalis.[19]  See 11 U.S.C. § 550(a).

2        The complaint also seeks to recover the pre-petition

3    transfer as a fraudulent conveyance pursuant to 11 U.S.C. § 548.

4    However, because Mrs. McGrath was indebted to the Assalis, and

5    because an antecedent debt may serve as reasonably equivalent

6    value for a transfer, recovery under the third claim for relief

7    is not appropriate.

8

9                                IV

10        The ninth, eleventh, twelfth, thirteenth, and fourteenth

11   claims for relief are not based on the Bankruptcy Code.

12        The ninth claim for relief seeks to enforce Mrs. McGrath's

13   rights (but which now belong to the trustee) as a minority

14   shareholder in CVAP, AHSI, and CGNC to review the books and

15   records of those entities.

16        As to CVAP, given the seizure of Mrs. McGrath's interest,

17   and given that the court will compel the Assalis to pay the value

18   of her interest to the trustee, those rights no longer exist.

19        As to CGNC and AHSI, the defendants have consistently

20   conceded that the McGraths and the Staacks are equity owners of

21   these entities and there is no convincing evidence that the

22   trustee, as the successor to Mrs. McGrath's interest, has been

23

24        [19]    The first claim for relief also sought to recover the
25   preferential transfer.  However, this claim assumes the transfer
     was within 90 days of the filing of the petition.  The record
26   does not permit the court to fix the precise date of the
     transfer.  It is clear only that it occurred sometime after June
27   7, 2004.  Because this date is within one year of the petition,
     the court will permit recovery but only under the second claim
28   for relief.

                                -41-

denied access to their records.  Other than to declare that the
trustee is the successor to Mrs. McGrath's 12.75% interest in
these two entities, the court will grant no relief to the trustee
under the ninth claim for relief.

Nor will any relief be awarded to the trustee under the
eleventh, twelfth, thirteenth, and fourteenth claims for relief.
In these claims, the trustee seeks to pursue alleged claims of
CVAP against the defendants for causing CVAP to transfer its
assets to the defendants.

Relief under these claims is not appropriate because the
court is awarding the trustee the value of Mrs. McGrath's
interest in CVAP.  This is, in effect, a forced sale of that
interest by the estate to the Assalis.

And, as to the pre-petition sale of the Starn Ranch by CVAP
and the transfer to the Assalis of Mrs. McGrath's share of the
net sale proceeds, the court has permitted the trustee to recover
this transfer as a preference.  Had it concluded that it was not
a transfer of Mrs. McGrath's property, relief pursuant to these
derivative claims might be appropriate.

Because the Assalis must pay the trustee for Mrs. McGrath's
interest in CVAP as of the petition date, and because it must
also pay for the pre-petition transfer of her share of the Starn
Ranch proceeds, it would be incongruous also to require the
Assalis to permit the trustee to enforce Mrs. McGrath's rights as
a member of CVAP.

Further, at trial the court granted judgment on partial
findings on the twelfth, thirteenth, and fourteenth claims for
relief.  For the reasons stated on the record, the court should

-42-

1  have given similar relief on the eleventh claim for relief.

2

3                                    V.

4       Many of the claims for relief ask for a recovery against

5  Assali Farm Properties, LP, as well as the Assalis, on the ground

6  that the Assalis ultimately transferred the assets of CVAP to

7  Assali Farm Properties, LP.  The court will award no relief

8  against Assali Farm Properties, LP.

9       Had the evidence indicated that Mrs. McGrath's interest in

10 real or personal property been transferred to the Assalis and

11 they, in turn, had transferred by that property to Assali Farm

12 Properties, LP, relief against Assali Farm Properties, LP, as

13 well as the Assalis would be appropriate.  They would all be

14 mediate and immediate transferees under section 550(a)(2).

15      However, the Assalis received Mrs. McGrath's membership

16 interest in CVAP, not tangible property.  Later, the Assalis may

17 have caused CVAP to divest and transfer assets to themselves

18 and/or Assali Farm Properties, LP.  But, they did not transfer

19 Mrs. McGrath's former interest in CVAP to Assali Farm Properties,

20 LP.  Assali Farm Properties was not the ultimate recipient of the

21 property transferred to the Assalis.

22

23                                    VI

24      Therefore, once the attorneys' fees and costs of the trustee

25 are fixed by the court, the court will enter judgment in his

26 favor and against the Assalis.  The trustee shall recover

27 $36,699.19 from the Assalis on the second claim for relief;

28 $161,506.23 from the Assalis on the alternative grounds pleaded

                                    -43-

1  in the fourth, fifth, sixth, and eighth claims for relief;

2  nothing on the first, third, seventh, tenth, eleventh, twelfth,

3  thirteenth, and fourteenth claims for relief; and on the ninth

4  claim for relief, the court will declare that the bankruptcy

5  estate owns a 12.75% interest in CGNC and AHSI.  No relief will

6  be awarded in favor of the trustee against the Staacks or Assali

7  Farm Properties, LP.

8  Dated: *31 March 2008*

9                                    By the Court

10

11                                   _____
                                     Michael S. McManus, Chief Judge
12                                   United States Bankruptcy Court

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF MAILING**

I, Susan C. Cox, in the performance of my duties as a judicial assistant to the Honorable Michael S. McManus, mailed by ordinary mail to each of the parties named below a true copy of the attached document.

Iain MacDonald
MacDonald & Associates
221 Sansome St
San Francisco, CA 94104

Michael Ijams
Curtis & Arata
1300 K St 2nd Fl
PO Box 3030
Modesto, CA 95353

Dated: March *31*, 2008

_Susan C. Cox_
Susan C. Cox
Judicial Assistant to Judge McManus